(C.D. 4240)

EL PASO NATURAL GAS PRODUCTS CO. *v.* UNITED STATES

UNITED STATES CUSTOMS COURT, SECOND DIVISION

(Decided June 28, 1971)

*Glad & Tuttle* (*George R. Tuttle* and *Hudson F. Edwards* of counsel) for the plaintiff.

*L. Patrick Gray, III*, Assistant Attorney General (*Morris Braverman* and *Steven P. Florsheim*, trial attorneys), for the defendant.

Before RAO, Chief Judge, FORD and NEWMAN, Judges

NEWMAN, Judge: The issue in these two consolidated protests concerns the proper rate of duty on certain merchandise imported from West Germany in June and September 1967, invoiced as "Cobalt Catalyst Z–1605 non-reduced type". The merchandise was assessed with duty by the Government at the rate of 18 per centum ad valorem under the provision in item 658.00 of the Tariff Schedules of the United States (TSUS) for articles of base metals.

Plaintiff claims that the merchandise is properly dutiable at the rate of 10.5 per centum ad valorem under the provision in item 423.96, TSUS, for "Other" mixtures of two or more inorganic compounds.

Alternative claims, not having been argued in plaintiff's brief, are deemed abandoned and are dismissed.

We have concluded that plaintiff's claim under item 423.96, TSUS, should be sustained.

STATUTES INVOLVED

Classified under:

Schedule 6, part 3, subpart G:

658.00    Articles of base metals not provided for in the foregoing provisions of this subpart, not coated or plated with precious metal_____    18% ad val.

Claimed under:

Schedule 4 headnotes:

\*        \*        \*        \*        \*        \*        \*

2. (a) The term "compounds", as used in this schedule, means substances occurring naturally or produced artificially by the reaction of two or more ingredients, each compound—
(i) consisting of two or more elements,
(ii) having its own characteristic properties different from those of its elements and from those of other compounds, and
(iii) always consisting of the same elements united in the same proportions by weight with the same internal arrangement.

\*        \*        \*        \*        \*        \*        \*

3. (a) The term "mixtures", as used in this schedule, means substances consisting of two or more ingredients (i.e., elements or compounds), whether occurring as such in nature, or whether artificially produced (i.e., brought about by mechanical, physical, or chemical means), which do not bear a fixed ratio to one another and which, however thoroughly commingled, retain their individual chemical properties and are not chemically united. The fact that the ingredients of a product are incapable of separation or have been commingled in definite proportions does not in itself affect the classification of such product as a mixture.

\*        \*        \*        \*        \*        \*        \*

Schedule 4, part 2, subpart C:

Mixtures of two or more inorganic compounds:

\*        \*        \*        \*        \*        \*        \*

423.96    Other _____    10.5% ad val.

## The Record

At the trial, plaintiff called five witnesses and introduced in evidence six exhibits. The official papers were received without marking. Defendant presented no evidence.

Guy Moore, employed by El Paso Natural Gas Products Co. as technical assistant to the operating vice-president, has been familiar with the manufacture and use of catalysts for over twenty years. Previous to this position Moore headed the research and development department.

Moore, who negotiated the purchase of the imported catalyst, explained that a "catalyst" is a substance which influences the rate of a chemical reaction without itself being consumed or entering into the reaction; that he knew the particular method of manufacturing Z–1605 non-reduced catalyst, and had observed the plant in Germany "in which this particular catalyst is manufactured".

The witness described the method of manufacture as follows (R. 45–46) :

> Small pellets of pumice are the base upon which the catalytic materials are impregnated. The catalyst consists of cobalt, manganese and silver oxides impregnated on pumice. This is done by starting with the metallic elements and dissolving them in nitric acid to make a liquid mixture of cobalt nitrate, silver nitrate and manganese nitrate. An organic thickener for comparison, let's say like your wife uses to make starch for shirts, is added to this acid mixture to make it thick and these pellets of pumice and this liquid and salts are tumbled together and the liquid is evaporated off and the cobalt nitrate, silver nitrate and manganese end up coated in these pellets. These pellets are then dried. After drying, they are put in a high temperature furnace and the cobalt nitrate, manganese nitrate and silver nitrate are decomposed at extremely high temperature to cobalt oxide, manganese dioxide and silver oxide. *And that is the material that is made in Germany that is shipped to us, and that's it.* [Emphasis added.]

Continuing, Moore testified that he had observed the use of the Z–1605 catalyst in the United States and had supervised the manufacture of the product for which it was used (hexamethylene diamine).

After familiarizing himself with the definitions of "compounds" and "mixtures" in the headnotes to schedule 4, TSUS, Moore opined that the non-reduced Z–1605 catalyst is a mixture of chemical compounds within the terms and conditions of those definitions; that pumice itself is a mixture of several different compounds (silicates) ; that all of the "elements" of the catalyst are inorganic, since "[a]t the temperature at which this catalyst was calcined, organic compounds would decompose"; and that although pumice is a mineral substance, the catalyst as a whole is not a mineral substance.

Perry Payne, employed by El Paso as a clerk at the chemical material warehouse in Odessa, Texas, received shipments in 1967 of Z–1605 catalyst pursuant to purchase orders and extracted samples. Exhibit 4 was the type of cardboard container in which Payne packed samples of the catalyst.

From Payne's testimony and the exhibits in evidence, the following additional facts appear:

On February 10, 1967 El Paso issued purchase order No. P 37251 to the German manufacturer covering 105,000 pounds of "Z–1605 Cobalt Catalyst". The merchandise was transported to the United States in drums via ocean vessel and arrived in four shipments.

On June 22, 1967 El Paso entered (at the port of Houston) drums 1 to 57 of "Catalyst Z–1605 non-reduced type", shipped pursuant to its purchase order P 37251. This shipment is covered by entry 31243 (second invoice) and is the subject of protest 69/8320. When this importation arrived, Payne noted the receipt of the 57 drums on a copy of the purchase order and attached packing slip (exhibit 5). No sample was extracted from drums 1 to 57. Payne, however, extracted a sample (exhibit 4), from drums 58 to 114 (which arrived in another shipment pursuant to the same purchase order).

On July 10, 1967 El Paso issued purchase order No. P 40723 to the exporter covering 105,000 pounds of "Z–1605 Cobalt Catalyst, Unreduced". That merchandise was transported to the United States in drums via ocean vessel and arrived in seven shipments.

On September 19, 1967 El Paso entered two shipments of the catalyst at the port of Houston. Entry 14974 included drums 16 to 53, and entry 150034 included drums 54 to 91. Those entries are covered by protest 69/12730. Payne removed samples from drums 39 and 80, placing them in cardboard containers similar to exhibit 4. On the containers, Payne wrote the purchase order number, the type of catalyst (according to the description on the drums), the name of the vessel and the specific drum from which this sample was taken. The two samples were taken to the research and development laboratory.

Bert Wyman, an analytical chemist in El Paso's research and development department, testified that his duties included inorganic analysis; that he had received samples of a certain catalyst for analysis in 1967 packed in cardboard boxes similar to exhibit 4; that under his supervision and in his presence such samples were transferred by technicians into polyethylene bottles, identified as exhibits 1, 2 and 3; that the identifying information written on the cardboard containers was transferred by a technician to the bottles,[1] and that the

---

[1] According to the identification written on the bottles, exhibit 2 is a sample from drum 39 and exhibit 3 is a sample from drum 80. Both samples refer to purchase order P 40723.

reason for transferring the samples from the boxes to the bottles was that it was "inconvenient to handle the box".

Wyman further stated that he had analyzed a sample of Z-1605 non-reduced catalyst taken from exhibit 1 for the purpose of determining whether cobalt and manganese were present as a base metal or as a compound. From his tests, Wyman concluded that cobalt and manganese were present in the catalyst as compounds rather than as metals.

Thurman C. MacFearin, an assistant group leader and an assistant to Wyman in the wet chemical division of El Paso's analytical laboratory, analyzed samples taken from exhibits 1, 2 and 3 for cobalt, manganese and silver. His tests showed that the samples had cobalt, manganese and silver present in them, and he performed another test to determine the amount of oxygen in the catalyst.

John W. McDowell, Jr., a senior research chemist in charge of El Paso's analytical research and development department, supervised and reviewed the tests performed by Wyman and MacFearin, and was of the opinion that in the catalyst "[c]obalt exists in a combined form, probably as the oxide, or a mixture of oxides"; that manganese exists as an oxide; that no free cobalt was present in the catalyst; and that pumice is a mixture of several different compounds.

1.

Plaintiff contends that the Government's classification is erroneous inasmuch as the Z-1605 non-reduced catalyst does not contain any "base metals"; that the catalyst is a mixture of two or more inorganic compounds, and therefore is properly classifiable under the claimed provision.

In defense of the classification, the Government offered no official samples or laboratory analyses of its own, and submitted no testimony to contradict or rebut that given by plaintiff's witnesses. It appears that defendant relies almost entirely upon plaintiff's asserted failure to connect the samples of catalyst in evidence with the shipments involved. However, we find under all the facts and circumstances that the involved merchandise consisted of Z-1605 non-reduced catalyst, and that the samples introduced in evidence by plaintiff (although not necessarily from the instant shipments) are representative of such catalyst for the purpose of determining whether it consists of an article of base metals, as classified, or a mixture of two or more inorganic compounds, as claimed.

2.

The Government's classification under item 658.00, TSUS, is of course predicated upon a determination that the importations were

composed wholly or in chief value [2] of "base metals". Headnote 2(b) of schedule 6 provides:

> (b) the term "base metal" embraces aluminum, antimony, arsenic, barium, beryllium, bismuth, boron, cadmium, calcium, chromium, *cobalt*, columbium, copper, gallium, germanium, hafnium, indium, iron, lead, magnesium, *manganese*, mercury, molybdenum, nickel, rhenium, the rare-earth metals (including scandium and yttrium), selenium, silicon, strontium, tantalum, tellurium, thallium, thorium, tin, titanium, tungsten, uranium, vanadium, zinc, and zirconium, and base-metal alloys; [Italics added.]

It is clear from the foregoing headnote that the term "base metal" in the tariff schedules embraces only certain metallic elements *per se* (and base metal alloys), and does not include metallic oxides.[3]

The record establishes that the Z–1605 non-reduced catalyst, in its condition as imported, did not contain "cobalt" or "manganese", as provided in headnote 2(b), *supra*, but was composed of inorganic compounds. This is supported by the chemical analyses and conclusions drawn therefrom by plaintiff's well qualified witnesses, and the testimony of Moore who was personally familiar with the chemical composition of the catalyst and the manufacturing process in the exporter's plant in Germany.

### 3.

Respecting the pumice component of the catalyst, the record establishes that pumice is a mineral substance consisting of several different silicate compounds.[4] Although pursuant to headnote 1(i) of schedule 4, "mineral products provided for in schedule 5" are excluded from schedule 4, the instant catalyst was not classified by the Government as one of the mineral products in schedule 5. In classifying the importations as articles of base metals, the Government presumably found that the merchandise was not one of the mineral products in schedule 5. Moreover, defendant has not abandoned its classification, nor does it now claim that the provisions of schedule 5 apply to the importations. Under these circumstances, we do not deem either the exclusionary headnote in schedule 4, or the provisions of schedule 5, to be in issue.

Finally, we have noted that plaintiff's witnesses, after having familiarized themselves with the headnote definitions of "compounds" and "mixtures" set forth in schedule 4, were of the opinion that the instant catalyst conformed to the criteria set forth in those definitions.

---

[2] Tariff Schedules General Headnotes and Rules of Interpretation, 9(f)(1).

[3] In *Hackh's Chemical Dictionary*, Fourth Edition (1969), the term "oxide" is defined as: "a binary compound of oxygen generally with a metal, or non-metal".

[4] Also, *Hackh's Chemical Dictionary* defines pumice as: "a light porous stone of volcanic origin, which consists of the silicates of aluminum, sodium, and potassium; an abrasive and catalyst base".

We are clear that the Z–1605 catalyst non-reduced is properly classifiable as "Other" mixtures of two or more inorganic compounds under item 423.96, TSUS, rather than as articles of base metals under item 658.00, TSUS.

The protests are sustained, and judgment will be entered accordingly.